IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

UNITED STATES OF AMERICA,      )
                               )
            Plaintiff,         )
                               )
      v.                       )      Criminal Action No.
                               )      06-00386-01-CR-W-HFS
DERRICK L. YOUNG,              )
                               )
            Defendant.         )

**REPORT AND RECOMMENDATION TO DENY
DEFENDANT'S MOTION TO SUPPRESS EVIDENCE AND STATEMENTS**

Before the court is defendant's motion to suppress evidence
and statements on the grounds that defendant's residence, truck,
and car were searched without his consent and without a warrant,
and his statement providing his cell phone number was made
without being advised of his Miranda warnings.  I find that
defendant voluntarily consented to the search of his residence,
his truck, and his car, and that asking defendant for his phone
number before advising him of his Miranda rights was proper.
Therefore, defendant's motion to suppress should be denied.

*I.*   *BACKGROUND*

On September 13, 2006, First Federal Bank was robbed.  On
September 28, 2006, that same bank was robbed again, and the
employees believed it was the same man who committed both
robberies.  Witnesses who lived near the bank reported having
seen a pickup truck parked near their house and observed its
occupant walk around their house toward the bank.  His

description matched the description of the bank robber.  The
witnesses had written down the license plate number of the truck,
which was registered to defendant.  The next day, agents went to
defendant's house and searched his house, truck, and car,
recovering clothing that matched the description of the bank
robber's and a black bag which matched the description of the bag
used by the robber.  Prior to advising defendant of his <u>Miranda</u>
rights, a special agent of the FBI asked defendant for his name,
address, phone number, and place of employment.  The government
later subpoenaed defendant's phone records and learned there was
no cell phone activity during the time of the bank robberies.

On October 12, 2006, defendant was charged in a criminal
complaint with the armed bank robbery of First Federal Bank on
September 28, 2006.  On November 1, 2006, an indictment was
returned charging defendant with that armed bank robbery and with
using a firearm during a crime of violence.

On March 16, 2007, a superseding indictment was returned
adding a charge of armed bank robbery of the First Federal Bank
on September 13, 2006, and another count of using a firearm
during a crime of violence.  Defendant filed the instant motion
to suppress on April 13, 2007.  On April 17, 2007, the government
filed a response, arguing that defendant voluntarily consented to
the search of his residence and vehicles, and that asking
defendant for his telephone number does not require a <u>Miranda</u>

2

warning.

On April 24, 2007, I held an evidentiary hearing on defendant's motion to suppress. The government appeared by Assistant United States Attorney Michael Warner. The defendant was present, represented by James Daniels. Special Agent Michael Mrachek with the Federal Bureau of Investigation testified for the government, and defendant testified in his own behalf. In addition, the following exhibits were admitted:

> P. Ex. 1 Consent-to-search form, Advice of Rights Form, and Receipt for Property Seized

> D. Ex. 1 Photograph showing defendant's red Charger parked in the driveway with marked police vehicle behind it

## II.  *EVIDENCE*

On the basis of the evidence presented at the suppression hearing, I submit the following findings of fact:

1.   On September 13, 2006, Alicia Bazzle, a teller at First Federal Bank, was approached by a large-framed black male at approximately 12:45 p.m. (Tr. at 5). The man had a handgun and a beige or tan bag, and he demanded money (Tr. at 5). After he received the money, the robber exited the bank (Tr. at 5). The robber was described as wearing a white dress shirt and some type of white mask, possibly a surgical mask, over the bottom part of his face (Tr. at 5). He also wore gloves (Tr. at 5).

2.   On September 28, 2006, at approximately 12:25 p.m., Melanie Wilson, a teller at First Federal Bank, was approached by

Case 4:06-cr-00386-HFS   Document 57   Filed 05/10/07   Page 3 of 22

a large-framed black male who pointed a handgun at her and demanded money (Tr. at 4). She provided him with money from her teller station and then also from an additional teller station next to hers (Tr. at 4). The robber used a black bag with a drawstring to carry the money (Tr. at 4). After he received the money, he exited the bank (Tr. at 4). Alicia Bazzle was present just behind the victim tellers during this second robbery, and she believed this robber was the same man who had robbed the bank on September 13 (Tr. at 5-6).

   3.   The witnesses in the bank described the robber as a large-framed black male wearing a grey hoodie and dark pants, his face was partially covered, and he wore glasses and gloves (Tr. at 4-5). The witnesses reported that defendant had a small semiautomatic handgun (Tr. at 5).

   4.   Kenya Dean and her fiancé John lived approximately one to one and a half blocks from the bank and were interviewed (Tr. at 6). They reported having seen a green extended cab pick up truck with tinted windows parked beside their house with one individual inside (Tr. at 6). He waited in the truck for several minutes (Tr. at 6). The witnesses wrote down the license plate number of the truck, and provided that to Special Agent Dirk Tarpley when they were interviewed (Tr. at 7). They described the man inside the truck as a large-framed black male wearing a dark grey hoodie with dark pants and having at least one hand in

4

his pocket and walking around the house toward the bank (Tr. at 7). This occurred during the same general time frame as the bank robbery on the 28th (Tr. at 7-8).

5. The registration on the license plate came back to the defendant with an address of 1909 Elmwood (Tr. at 8). The dispatcher ran computer inquiries on defendant and learned that defendant was born in 1973, had a drug conviction, and resided at 310 Southeast Wingate in Lee's Summit (Tr. at 8-9, 45).

6. Special Agents Mrachek and Tarpley went to defendant's residence on September 28 and observed the green pickup truck parked there (Tr. at 9). They interviewed neighbors and learned that if a red Charger was parked at defendant's residence, he was probably there (Tr. at 10, 28).

7. The investigators waited until the next day, September 29, and went to defendant's residence at about 7:00 a.m. (Tr. at 10). There was one uniformed officer and four FBI agents (Tr. at 26). A marked police vehicle was parked on the street but blocking defendant's driveway (Tr. at 27; D. Ex. 1). The car was not parked in that manner to prevent anyone from leaving, it was parked that way so that the people in the house could see that the police were at that house (Tr. at 27-28).

8. The green pickup truck was there with the same license plate as the one recorded by the Deans, and a red Charger was parked there as well (Tr. at 10, 11). Special Agent Mrachek

5

planned to knock on the door and immediately handcuff defendant if he answered (Tr. at 10-11). This was for officer safety, as the investigators were aware of defendant's criminal history and the fact that he had possibly committed two armed bank robberies in the past month (Tr. at 10-11).

9. The two agents approached the multi-story split foyer house (Tr. at 11). Defendant answered the door and Special Agent Mrachek immediately handcuffed him (Tr. at 11-12, 29). Special Agent Mrachek told defendant he was being cuffed for officer safety, and that he was not under arrest (Tr. at 12). Special Agent Mrachek asked if there were any other people in the house who could hurt the officers, and he asked defendant for consent to search the residence for other people (Tr. at 12, 30). Defendant gave his consent, and officers entered the residence to perform a sweep search (Tr. at 12). During the sweep search, Special Agent Mrachek stayed with defendant on the little landing next to the front door (Tr. at 12). The sweep search took one to two minutes (Tr. at 13). There was no one else present except defendant's child, and nothing was seized during the sweep search (Tr. at 13, 30).

10. Once the sweep was completed, Special Agent Mrachek, Special Agent Stinnett, and defendant moved up to the kitchen and sat down at the table (Tr. at 13, 14). The agents moved defendant's handcuffs from behind his back to in front of him for

6

comfort and also because they wanted to talk to him about consent to search the residence (Tr. at 14).

11.  Special Agent Mrachek told defendant they were there about a bank robbery investigation (Tr. at 14).  He asked defendant for consent to look for evidence related to that bank robbery (Tr. at 14).  Special Agent Mrachek showed defendant a consent-to-search form (Tr. at 15).  The form was blank and Special Agent Mrachek wrote in defendant's address and the description of his two vehicles (Tr. at 15, 80).

12.  The house and both of the cars were listed on the form when it was presented to defendant for signature (Tr. at 80). The Charger was not searched before the consent-to-search form was signed (Tr. at 80).  Defendant initialed the form next to the final item to be searched, the Charger, because originally the agents were only going to have the residence on that form but decided to put the cars on that form as well, using only one form for everything (Tr. at 80).  He had been asked to initial the form by the final item to indicate that he was agreeing to a search of the vehicles as well as the residence (Tr. at 81). This was done before defendant signed the form (Tr. at 80-81). Normally the agents try to get one consent form for each item searched (Tr. at 81).

13.  Special Agent Mrachek asked defendant to read the document, and if he consented to them searching, he should sign

Case 4:06-cr-00386-HFS   Document 57   Filed 05/10/07   Page 7 of 22

the document (Tr. at 15).

14. Special Agent Mrachek observed defendant reading the document which says:

1. I have been asked by Special Agents of the Federal Bureau of Investigation to permit a complete search of:
   -- 310 SE Wingate, Lee's Summit, Missouri
   -- 95 Dodge (green) Dakota, Mo license plate U71S49
   -- 06 Dodge Charger (red)
2. I have been advised of my right to refuse consent.
3. I give this permission voluntarily.
4. I authorize these agents to take any items which they determine may be related to their investigation.

(P. Ex. 1A; 80).

15. Defendant did not express any confusion about the form, and he did not ask any questions about it (Tr. at 15-16). Special Agent Mrachek asked defendant about consenting as soon as they sat down at the table (Tr. at 16).

16. Special Agent Mrachek and Special Agent Stinnett both saw defendant sign the consent-to-search form at 7:30 a.m. (Tr. at 16, 33; P. Ex. 1A). Defendant signed the form ten to 15 minutes after he and the agents sat down at the kitchen table (Tr. at 16-17). No one threatened defendant, yelled at him, got angry with him, or promised anything to get him to sign the form (Tr. at 17). No one threatened to get a search warrant if he did not sign the form (Tr. at 17). Defendant did not become angry or upset during the discussion about consent to search (Tr. at 17). He did not appear to be intoxicated or under the influence of drugs at any time while the agents were present (Tr. at 18).

8

Defendant never tried to revoke his consent, and he did not object to the search while it was taking place (Tr. at 18).

17.   While Special Agent Mrachek and defendant were sitting at the table, Special Agent Mrachek asked background questions such as defendant's place of employment, information about his residence, his telephone number, and rapport-building type questions (Tr. at 19).  Defendant had not been advised of his <u>Miranda</u> rights because the agent was not asking him questions regarding his involvement in the bank robbery (Tr. at 19, 25).  No questions were asked regarding the bank robbery (Tr. at 32).

18.   There did come a time when Special Agent Mrachek approached the subject of the bank robberies (Tr. at 20).  He told defendant that he wanted to ask defendant questions about the bank robbery and defendant's involvement in it, but prior to doing that, he needed to advise defendant of his rights (Tr. at 20).  At 7:58 a.m., Special Agent Mrachek used an Advice of Rights form (P. Ex. 1B), verbally went over the form with defendant, and then allowed defendant to read the form out loud (Tr. at 20-21, 32, 33).  Defendant did not sign the form and did not provide a statement that day (Tr. at 21, 42).  Defendant said he wanted to consult with an attorney before answering any questions about the bank robbery (Tr. at 21).

9

19.  During the search of defendant's home, agents recovered a silver watch with a red leather band[1] from the glove compartment of the truck; a pair of black jeans, a grey hoodie, and a pair of white tennis shoes recovered from the back seat of the Charger; a dark felt bag recovered from the floor of the garage; and a Kansas City Royals baseball hat recovered from defendant's living room (Tr. at 21-22).  Those items were seized because they were consistent with the descriptions of the robber's clothing given by the witnesses at the bank (Tr. at 22).

20.  The search was concluded and the agents left defendant's residence at about 8:30 a.m., 90 minutes after they first arrived (Tr. at 22, 24).  Defendant's handcuffs were removed, and he was not arrested (Tr. at 23).  The agents did not arrest defendant because other agents were conducting investigation as well and they needed to communicate with those agents and analyze all of the information before making an arrest (Tr. at 23).  Before leaving the residence, the agents had defendant sign a receipt for the property taken (P. Ex. 1C; Tr. at 23).

21.  Sometime later, agents subpoenaed defendant's cell phone records (Tr. at 26).  The records indicate that there was

---

[1]The watch was seized because in one of the surveillance photographs, it looked like there was something red near his wrist; however, it was later determined that it was an item from the bank and not a watch (Tr. at 22).

no cell phone activity on defendant's cell phone during the time surrounding both of the bank robberies (Tr. at 49-50).

22. Defendant testified during the hearing. His testimony was as follows:

a. At the time the police arrived at defendant's house, he was sleeping (Tr. at 56). He was home alone with his seven-year-old daughter, Derria (Tr. at 56-57). He was awakened by the loud banging on the door and his daughter telling him there were police outside (Tr. at 57). Defendant went to the door wearing his pajama bottoms and a t-shirt (Tr. at 57). He opened the door to police with guns drawn (Tr. at 57-58). They told him to get his hands up, and Special Agent Mrachek put handcuffs on defendant (Tr. at 58). Derria was standing at the top of the stairs watching (Tr. at 59).

b. The police asked him if there was anyone else there who could hurt them (Tr. at 59). He said his daughter was there (Tr. at 59). They searched the house to see if anyone else was there (Tr. at 59-60). They all walked up the stairs to the dining room, and defendant told his daughter to calm down and finish getting ready for school (Tr. at 60). Defendant, Special Agent Mrachek, Special Agent Stinnett, and a Lee's Summit police officer sat down at the table after defendant's handcuffs were moved to the

11

front (Tr. at 60).

      c.    The police then gave defendant the consent-to-search form (Tr. at 61). No one told him that he had a right to refuse to consent (Tr. at 62). The form listed defendant's residence and the truck, but did not include the Charger (Tr. at 64, 74, 76-77). They asked if they could search the house and the truck, and defendant said, "yeah" (Tr. at 64). Defendant signed the consent form along with the agents (Tr. at 64).

      d.    Later Special Agent Mrachek came back and said they needed to add the Dodge Charger onto the form because they searched the Charger but forgot to put it on the form (Tr. at 64, 74-77). Defendant was told to initial after the Charger that he gave consent after the search had been completed (Tr. at 64-65, 74). Defendant could see the Charger from where he was seated and he saw it being searched before it was listed on the consent form (Tr. at 65).

      e.    Defendant's daughter's school bus comes between 7:08 and 7:11 a.m. (Tr. at 65). She went outside where the bus picked her up (Tr. at 66). Defendant's daughter being upset was part of the reason he let the officers do what they needed to do and get it over with (Tr. at 66).

f.   While they were sitting at the table, Special Agent Mrachek started asking questions about who lives in the house (Tr. at 67).  This was before he gave defendant his <u>Miranda</u> warnings (Tr. at 67).

g.   Although defendant has dealt with the police in the past, he was intimidated by these agents because they were not "regular police" (Tr. at 67).

h.   Defendant was 32 years of age at the time, he has a high school education, and he has some additional medical education beyond high school (Tr. at 67-68).  Defendant has no difficulty reading (Tr. at 68).  Defendant was not intoxicated or under the influence of drugs, and he does not suffer from any type of mental illness (Tr. at 68).

i.   When defendant was presented with the consent-to-search form, he read the entire form, including the part where it says, "I have been advised of my right to refuse consent.  I give this permission voluntarily.  I authorize these agents to take any items which they determine may be related to their investigation." (Tr. at 69-70).  However, the first part about searching the house and the truck sticks out in his mind (Tr. at 70).  Defendant did sign and date the form (Tr. at 70).

j.   Defendant never raised a concern that day about the police searching the car before adding it to the consent

13

form; he never tried to revoke his consent; he was not upset or angry that day; the agents did not threaten him or yell at him that day (Tr. at 70-71). The agents talked to him about consenting to a search, then they provided the consent-to-search form to defendant, and defendant signed the form (Tr. at 71).

k. Defendant has been arrested before, charged before, and convicted before (Tr. at 71-72). He has read his rights before (Tr. at 72). Officers had tried to interrogate him before (Tr. at 72).

23. I do not find credible the portion of defendant's testimony about the Charger not being on the consent-to-search form before he signed it or that the Charger was searched before the consent-to-search form was signed. These are my reasons:

a. Special Agent Mrachek was asked at the hearing what made him think there was anything in the Charger (Tr. at 48). Special Agent Mrachek said, "Well, as part of our investigation, in the same respect as the house, we would not want to leave that rock unturned. We would want to search all our avenues and follow all our avenues in an attempt to gather the evidence." (Tr. at 48). It is simply not plausible that investigators would forget to write one of three places on a form, when they were hoping to get consent to search all three of those places.

14

b. Defendant testified that his daughter's demeanor, her being upset, was one of the reasons he agreed to consent to the search and get it over with. However, defendant's daughter left the house just a few minutes after the investigators arrived (i.e., at around 7:10 a.m.), and the consent-to-search form was not signed until 7:30 a.m., twenty minutes after defendant's daughter left.

c. The one place defendant claims the investigators forgot to list on the consent-to-search form is the place where almost all of the seized evidence was found.

d. Defendant made no comment at the scene when he allegedly watched the investigators search the Charger without consent, nor did he make any comment about the investigators allegedly adding the Charger to the consent form after they had searched the Charger; yet he was comfortable enough with the investigators to refuse to waive his Miranda rights and refuse to answer questions about the bank robbery.

### III. CONSENT TO SEARCH

Even when police officers have neither probable cause nor a warrant, they may search an area if they obtain a voluntary consent from someone possessing adequate authority over the area. United States v. Matlock, 415 U.S. 164, 171 & n. 7 (1974); Schneckloth v. Bustamonte, 412 U.S. 218, 222 (1973). Voluntary

15

consent need not amount to a waiver.  United States v. Chaidez,
906 F.2d 377, 380 (8th Cir. 1990).  Consent can be voluntary
without being an "intentional relinquishment or abandonment of a
known right or privilege."  Bustamonte, 412 U.S. at 235.  The
proper test is whether the totality of the circumstances demon-
strates that the consent was voluntary.  Id. at 226.

The government bears the burden of proving a voluntary
consent to search by a preponderance of the evidence.  Bumper v.
North Carolina, 391 U.S. 543, 548 (1968); United States v. Ramey,
711 F.2d 104, 107 (8th Cir. 1983).  The question of whether the
consent was voluntarily given is a question of fact for the trial
court.  United States v. Cortez, 935 F.2d 135, 142 (8th Cir.
1991); United States v. Alberts, 721 F.2d 636 (8th Cir. 1983).
Consent is voluntary if it was "the product of an essentially
free and unconstrained choice by its maker" rather than the
product of duress or coercion, express or implied.  Bustamonte,
412 U.S. at 225, 227.  This determination depends upon the
totality of the circumstances in a particular case.  Id. at 226.

The following characteristics of a person giving consent and
the environment in which consent was given are relevant when
assessing the voluntariness of the consent:

    a.   Age, Id., at 226; Haley v. Ohio, 332 U.S. 596, 599
          (1948);

    b.   General intelligence and education, United States v.
          Watson, 423 U.S. 411, 425 (1976); Bustamonte, 412 U.S.

16

at 226; <u>Payne v. Arkansas</u>, 356 U.S. 560, 567 (1958);
<u>Fikes v. Alabama</u>, 352 U.S. 191, 196-97 (1957);

c.   Whether the person was intoxicated or under the
     influence of drugs when consenting, <u>United States v.
     Rambo</u>, 789 F.2d 1289, 1297 (8th Cir. 1986);

d.   Whether the person consented after being informed of
     his right to withhold consent or of his <u>Miranda</u> rights,
     <u>Watson</u>, 423 U.S. at 424-25; <u>Bustamonte</u>, 412 U.S. at
     226;

e.   Whether, because the person had been previously
     arrested, he was aware of the protections afforded to
     suspected criminals by the legal system, <u>Watson</u>, 423
     U.S. at 424-25; <u>Laing v. United States</u>, 891 F.2d 683,
     686 (8th Cir. 1989); <u>United States v. Carter</u>, 884 F.2d
     368, 375 (8th Cir. 1989);

f.   Whether the person was detained and questioned for a
     long or short time, <u>Bustamonte</u>, 412 U.S. at 226;

g.   Whether the person was threatened, physically
     intimidated, or punished by the police, <u>Watson</u>, 423
     U.S. at 424; <u>Bustamonte</u>, 412 U.S. at 226; <u>Reck v. Pate</u>,
     367 U.S. 433, 442-43 (1961); <u>Laing</u>, 891 F.2d at 686;

h.   Whether the person relied upon promises or misrepre-
     sentations made by the police, <u>Watson</u>, 423 U.S. at 424;
     <u>Laing</u>, 891 F.2d at 686; <u>Carter</u>, 884 F.2d at 374-75;

i.   Whether the person was in custody or under arrest when
     the consent was given, <u>Watson</u>, 423 U.S. at 424;

j.   Whether the person was in a public or a secluded place,
     <u>Id</u>.; or

k.   Whether the person objected to the search or stood by
     silently while the search occurred, <u>Chaidez</u>, 906 F.2d
     at 381.

After applying these factors to the facts of this case, I
conclude that the defendant voluntarily consented to the search
of his residence and cars.

17

Defendant is an adult of general intelligence with education beyond high school. He was not under the influence of alcohol or drugs. Defendant gave consent after reading the consent to search form which states "I have been advised of my right to refuse consent". Defendant has experience with law enforcement and was aware of his rights with regard to searches and statements. Defendant was detained for a very short time prior to giving consent. There is no evidence that he was threatened, physically intimidated or punished, or that he relied on promises or misrepresentations made by the investigators. He did not express any confusion about the form, nor did he ask questions about it. In fact, defendant admitted that he said, "yeah" when asked if the investigators could have consent to search.

When defendant consented to the search, he was sitting in his own home, which is not unduly coercive. Finally, the facts indicate that defendant did not object while the search occurred.

There is no evidence at all, including in defendant's own testimony, that he did anything but voluntarily consent to the search. His representation that his concern for his daughter contributed to his decision to consent is neither plausible nor meritorious. Defendant's daughter left the house approximately 20 minutes before defendant signed the consent-to-search form, so it is implausible that he signed the form in order to comfort her. Furthermore, the test for voluntariness is whether

18

defendant's will was overborne by police conduct, not whether he chose to consent based on his own personal preferences for his family.

For the above reasons, I conclude that defendant voluntarily consented to the search of his residence, truck, and car, and his motion to suppress on this basis should be denied.

## IV. *DEFENDANT'S STATEMENT*

It is undisputed that defendant refused to waive his <u>Miranda</u> rights and refused to answer questions about the bank robberies. The issue here is whether the agent asking defendant for his phone number is tantamount to interrogation.

<u>Miranda v. Arizona</u>, 384 U.S. 436 (1966), requires that a suspect be advised of (among other things) his right to remain silent and to have an attorney with him during questioning. Law enforcement officers are required to advised a suspect of his <u>Miranda</u> rights only if custodial interrogation takes place. <u>Id</u>. Custody occurs either upon formal arrest or under any other circumstances where the suspect is deprived of his freedom of action in any significant way. <u>Id</u>. at 429.

It is undisputed that defendant was in custody at the time he provided the agents with his cell phone number. Defendant was in handcuffs and was clearly not free to leave.

The requirement that a person in police custody be advised of his right to remain silent and right to an attorney applies

19

only if the person is being interrogated.  United States v. Koontz, 143 F.3d 408, 410 (8th Cir. 1998).  In Miranda, the Court referred to "interrogation" as actual questioning initiated by law enforcement officers.  384 U.S. at 444.  The Supreme Court has since clarified that definition, finding that the "goals of the Miranda safeguards could be effectuated if those safeguards extended not only to express questioning, but also to 'its functional equivalent.'"  Arizona v. Maura, 481 U.S. 520, 526 (1987).  In Rhode Island v. Innis, 446 U.S. 291 (1980), the Court defined the phrase "functional equivalent" of express questioning to include "any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect."  Thus, not all government inquiries to a suspect in custody constitute interrogation and therefore need be preceded by Miranda warnings.  United States v. McLaughlin, 777 F.2d 388, 391 (8th Cir. 1985).

Requests for routine information, such as name and address, which is necessary for basic identification purposes, is not interrogation for purposes of Miranda.  Pennsylvania v. Muniz, 496 U.S. 582, 601 (1990); United States v. Jones, 266 F.3d 804, 812 (8th Cir. 2001), citing United States v. McLaughlin, 777 F.2d 388, 392-93 (8th Cir. 1985).  In United States v. Sims, 719 F.2d

20

375, 378-79 (11th Cir. 1983), a defendant's statement of his address and telephone number, furnished upon the request of a government agent at a post-arrest interview without first having been advised of his <u>Miranda</u> rights, was held admissible in the government's case-in-chief.  The inquiry involved basic identification information necessary for booking purposes, even though the response was used to link the suspect to the crime. <u>United States v. McLaughlin</u>, 777 F.3d at 391.  A request for routine information necessary for basic identification purposes is not interrogation under <u>Miranda</u>, even if the information turns out to be incriminating.  <u>Id</u>.  <u>See</u> <u>also</u> <u>United States v. Savatdy</u>, 452 F.3d 974, 976 (8th Cir. 2006)(asking for a suspect's telephone number is not interrogation for purposes of <u>Miranda</u>).

Only if the government agent should reasonably be aware that the information sought, while merely for basic identification purposes in the usual case, is directly relevant to the substantive offense charged, will the questioning be subject to scrutiny. <u>United States v. McLaughlin</u>, citing <u>United States v. Burns</u>, 684 F.2d 1066, 1075-76 (2d Cir. 1982), <u>cert</u>. <u>denied</u>, 459 U.S. 1174 (1983).

In this case, the investigators could not have known that defendant's cell phone number would be directly relevant to the bank robberies.  Until the phone records were subpoenaed, the government could not have known that there was no cell phone

21

activity during the time of both bank robberies.

Because I find that asking for defendant's telephone number need not be preceded by <u>Miranda</u> warnings, defendant's motion to suppress on this basis should be denied.

## V.    CONCLUSION

Based on the above-stated findings of fact and the law as discussed in sections III and IV, I make the following conclusions of law:

1.    Defendant voluntarily consented to the search of his residence, his truck, and his car.

2.    Special Agent Mrachek's asking defendant for his telephone number did not constitute interrogation for <u>Miranda</u> purposes.

Based on all of the above, it is

RECOMMENDED that the court, after making an independent review of the record and the applicable law, enter an order denying defendant's motion to suppress.

Counsel are advised that, pursuant to 28 U.S.C. § 636(b)(1), each has ten days from the date of this report and recommendation to file and serve specific objections.

/s/ Robert E. Larsen

ROBERT E. LARSEN
United States Magistrate Judge

Kansas City, Missouri
May 10, 2007

22